Good morning, your honors. Good morning. May it please the court, my name is Mark Dan, I represent Linda Clark, John Whiteman, and Dorothy and Michael Risch. I respectfully request to reserve five minutes for rebuttal. You may. Thank you, your honors. Your honor, when I started reading the district court decision in this case, one of the first paragraphs was as follows. Each of the named plaintiffs were individuals whose homes were foreclosed in cases where it appears beyond dispute that mortgage assignments, affidavits, and transfers were fabricated. That's the judge's finding as he started the decision. He went, and I was optimistic as I turned the page. However, Judge Polster went on in this case to dismiss our claims not just once, but three times in his decision, including one, the last one, relating to the Ohio Consumer Sales Practices Act, where it seems pretty clear to me that once the federal questions were decided by the judge, he lacked appropriate jurisdiction to dismiss those claims with prejudice and was required to remand the remand. That's an interesting question. He had jurisdiction, didn't he? Yes, he did. And so is he required to dismiss the state law claims once he has jurisdiction, or may he exercise supplemental jurisdiction? He may, except that, interestingly, even in his own order of dismissal of the judge's order, by the time he got to those claims, there was no longer any related federal jurisdiction. I agree with you, Your Honor. It's an interesting question, but it really doesn't go to the heart because I believe substantively all three decisions, all three issues that the judge raised, whether or not plaintiffs in the context of a Fair Debt Collection Practices Act claim or an Ohio Consumer Sales Practices Act claim have the right to challenge assignments, whether or not our plaintiff's claims, the Rish's and Mr. Whiteman, were barred by res judicata or collateral estoppel, and whether the Ohio Supreme Court decision in Anderson v. Barkley, which prohibited Consumer Sales Practices Act claims against loan servicers, actually prohibited proceeding on these claims. And a lot of those, all three of those decisions in some way are related to, I think, Judge Polster's misinterpretation of how this circuit looks at the issue of assignments of mortgages and endorsements of notes and fraudulent conduct in the process of mortgage foreclosure, most recently presented or decided by this Court in Wallace v. Washington Mutual. Instead he chose to use the Livonia Bank Standard, which was in a very different case, decided out of Michigan, in a very different standard. Michigan is a non-judicial foreclosure state. Ohio is a judicial foreclosure state. In Michigan the issue was to actually challenge the right of the plaintiff in the underlying case. It was a federal court case that was brought to enjoin a foreclosure, as opposed to a situation where the defendants, like the defendants in this case, LPS and the law firm that they hired and conspired with to fabricate documents, were taking the initiative to present those documents to the court themselves. Our clients were doing nothing at the time that they were sued based on the documents that Judge Polster did find were fabricated, and they were inhibited and prohibited, not just them, but the class of individuals that we sought to represent as well, from defending properly those claims because of the fabrications and the false statements that were made. So the assignment, the issue in this case is much less like the issue of whether a defendant homeowner can challenge the right of a plaintiff, in the Ohio context, of a plaintiff lender based on the assignments because there's some pretty good case law. I don't agree with it necessarily, but there's a lot of case law that says that you can't challenge the assignments in this context, but the issue here is really only whether those statements are false. Assuming we can get through the other barriers that Judge Polster established for us, which are are the defendants in this case debt collectors, and we contend that they are, and whether or not the Consumer Sales Practices Act somehow exempts default loan servicers like lender processing services. Do all of your claims depend ultimately on the validity of the assignments of the right to come against your plaintiffs, or close against them, or whatever it is they're doing? Is that true, or is there something else? No, our claims depend on whether or not, in an effort to collect a debt, a false statement was made. Was it a false statement as to whether they had the power to come against them on the assignments? Right, right. Whether they had the right... If the assignments are valid or unchallengeable, then everything else falls apart, is that right? That's correct, however... What sense does it make to have a system where you can't, unless there's a chance of double recovery, what system, what sense does it make to interpret the law to allow those kinds of challenges, when they owe the money? Because Congress... They're not going to have to pay twice. Congress, when they enacted the Fair Debt Collection Practices Act, and the Ohio legislature when they enacted the Consumer Sales Practices Act, said it was a prohibited act to offer false statements in an effort to collect a debt. So it's the falsity of the statement... Under the FDCPA, in fact, it's a strict liability standard. It doesn't matter. They can say this was on Sunday and it was really on Monday. That's correct. If everything else is equal, then that's a violation. And the complaint was replete... You get recovery for making false statements that make no difference? There's statutory damages, both under the FDCPA and potentially under the CSPA, and there's attorney's fees necessary to defend those false claims in court, which are recoverable. There's embarrassment, loss of credit. Certainly there are damages that flow from false statements made in the efforts to collect a debt. And in this case, the courts already decided that the documents were fabricated. The complaint had ample evidence, ample allegations, supportable allegations, plausible allegations, that Lender Processing Services was in the business of fabricating these documents and engaging with the defendant law firms to perpetuate this fraud on homeowners in Ohio and actually throughout the country. I don't know what the fraud is, though. The assumption is, just by assuming, that the money is owed, that the security interest is perfected and all of that, and the only fraud is whether that interest has been properly assigned, which I guess it was assigned and reassigned and reassigned, right? Your Honor, if... I'm just trying to get at the underlying fraud there. I mean, I'm just having trouble grasping it. It seems like, you know, you can say something's a fraud, but, you know, misspelling the date of the week is not a fraud. It just doesn't have any effect on anybody. Now, if you say, well, the statute says you get damages and attorney's fees for misspelling the address or inverting the numbers on the address or something like that when it makes no difference to anybody, that would be surprising to me that that's the way the law is. But that's basically what you're saying. No, I'm not saying that a mistake. A mistake is a defect. All right, a mistake or some other, you know, we've got a person under one corporate form suing you and technically it should be the other person suing you. If you only have to pay once and you owe it and this will pay off your debt, I'm not seeing what the underlying problem is. Your Honor, let's suggest that after court today you walk across the street to Fifth Third Bank with a check payable to Judge Cole that was endorsed by Judge Hood, who signed Judge Cole's name to the back of it. I am in favor of that, by the way. We might try it out. However, you're going to, actually, you would not be Judge Cole because Judge Rogers would collect. If I owe Judge Cole the money and it will pay it off and I won't have to pay it off any other way, what's the harm? Well, that doesn't, first of all, it doesn't necessarily mean. These loans, as our complaint in a very great detail alleges, these loans were sold multiple times. It is unclear, at best, who the real party in interest is and it is absolutely possible that somebody else may come forward in the future to attempt to enforce the note. We did. The complaint is about 90, we killed a lot of trees to get to a motion to dismiss in this case, but the whole scheme of securitization of these loans, they were sold at least six times in the process. Many of those transactions in many of those cases, including the cases of the Riches and Linda Clark and Mr. Whiteman, were not perfected as contemplated by the securitization scheme. It is absolutely possible that somebody else could come and try to enforce that note. Absolutely possible. Absolutely possible, but has anybody done that? Well, in fact... I mean, possible, I mean, everything's possible. It's possible that I can play in the NBA. It's pretty doubtful that I ever will. Judge Hood, in the case of the Whitmans and Linda Clark and Mr. and Mrs. Rich, they were fortunate enough to have thought to call a lawyer who raised these claims and defenses in court. In the case of the Whitmans and the Riches, a settlement was reached that reflected the danger and concluded a declaration of rights between the parties that protect them going forward. Now, by the way, because it's interesting because Judge Polster addressed this issue on the issue of race judicata and collateral estoppel, and I'm out of time if I can just finish this answer. Just briefly, please. Well, I'll address it on rebuttal if that's all right. Okay, that's fine. Okay. Good morning. Good morning. May it please the Court. Fred Goldberg of Berger-Singerman, Miami, Florida, on behalf of the LPS Appalese. Sharing time, are you not? Yes, Your Honor, if necessary. I'm prepared to address virtually all of the issues that were briefed. If there are questions that are pointedly specific to the law firm Appalese, I would defer to Mr. Ethelberry. Okay. Well, I'll let you keep track of time then. Thank you, Judge. This Court should affirm Judge Polster's order of dismissal because in each of the underlying foreclosures at the time they were filed, the foreclosing plaintiffs were undisputably holders of the notes that vested them with standing as of the time they filed the complaints. Because the foreclosing plaintiffs held the notes, there can be, as a matter of law, no material misrepresentation to support an FDCPA claim because the alleged misrepresentation is a lack of standing. Lack of what? Standing to foreclose. The Ohio Supreme Court's recent decision in Anderson v. Barclays establishes that the Appalese were not suppliers under the OCSPA and that the underlying transaction was not a consumer transaction and therefore all of Appalene's claims fail. And something struck me while listening... Plaintiffs' ODSPA claims fail. OCSPA claims. Yeah, I can't do the acronym, but the state... Ohio Consumer Sales Practices Act. Okay, go ahead. Sorry, Judge. And something struck me while listening to Mr. Dan's presentation because he has slightly shifted direction and now is saying that the misrepresentation which would support the FDCPA claim is the assignments. There's a significant problem with that because the assignments, each and every one of them, were executed in 2007, 2008, and 2009, two years before there was any default. If there is no default, there can be no debt collection. You've heard me say already the foreclosing plaintiffs held the notes. The basis for the claims in this litigation that were brought by the appellants is that the foreclosures were improper. This is not because the appellants were not in default. It's not because they cured their debts, but rather because of allegations of lack of standing. Notably, they do not assert any claims against the plaintiffs who filed the foreclosure actions. They do not assert any claims against the lenders. They do not assert any claims against the loan servicers. They do not assert any claims against the intervening assignors or assignees. Instead, they sue the law firms and they sue the vendor who provided services and technology. Because the plaintiffs held the notes at the time of the foreclosures, they had standing to foreclose. That is black letter law under Ohio law. No misrepresentation, no material false statement, no deceptive act. I'm trying to get at what their claim is. Their claim is that there was deception because they were misleading as to whether they legitimately were the right person to bring the foreclosures. Is that right? It's immaterial, Judge. I'm asking if that's how you understand their argument. That's sort of how I understand their argument. How is it different from what I said? Because they have added, at least in their briefing, this additional layer of the question of whether or not the pooling and servicing agreement was violated. The pooling and servicing agreement was violated by an alleged late transfer of the loans into the securitized... But that's still a challenge to the effectiveness of the transfer and therefore a challenge to the ability of these people to bring them. So in effect, according to your understanding of their claim, their claim is that they misled as to the legitimacy of their ability to bring these foreclosures. That is what they are contending. And that is candidly... And you're saying that that either has no basis or they can't bring that, or they're not allowed to raise that kind of a claim. That's precisely correct. Which one's stronger or easier? The easiest one, Judge, is that because the foreclosing plaintiffs held the notes undisputably at the time the foreclosures were filed, they possessed standing to foreclose. Even if the... Even if there were some... Even if they made misleading statements about their ability to get hold of those notes. Well, they had the notes. That's the real issue. That's what I'm saying. That's why I said... Yes. If there is some... Their right to the notes was... They made misleading statements about their right to their notes. You'd say still there's no claim here. That would be correct, Judge, because on the other side of the coin, the appellants lack standing to contest compliance with the pooling and servicing agreement, and they lack standing... Those cases which say they lack standing, are those under the FDCPA, or are they under sort of defense-to-foreclosure kinds of... See what I'm asking? They're actually both, because the question is really whether the assignments themselves are void or voidable, or even material. And our position... Because that's essential to their FDCPA claim, their FDCPA claim fails under these doctrines which say that they can't challenge the way that they got... the legality of their having the notes. Is that the argument? Exactly, Judge. Exactly. I began... Which cases rely on that kind of standing in the context of an FDCPA case? I don't believe I can, off the top of my head... They're in your briefs? There is some mention in the briefs. Lembeck, out of the Fourth Circuit, holds that RoboSign documents are not materially misleading, where borrowers work conceitedly in default, and the documents themselves are not... Saying that they're not misleading is not the same thing as saying you can't challenge them. That's correct, Judge. The principles... I cannot identify right now a particular FDCPA claim where it was held that this lack of standing precluded the claim. But you nonetheless argue... Candidly, I'm aware of unreported decisions in which I represented LPS, and that conclusion was reached. But I cannot. If you don't buy that, then what's the next... Certainly. ...most clearly dispositive argument? There... Well, with respect to the FDCPA claim, there are two separate arguments. The first is, as this Court held in the Wallace decision, to be actionable, a statement must be materially false or misleading. The statement that they are complaining of is the foreclosing plaintiff lacked standing to foreclose, and that is simply not the case. It is not even a misrepresentation, and it's certainly not materially false or misleading. That is simply, again, because the foreclosing plaintiffs possessed the notes, the notes were endorsed, they held the notes, and on that basis alone, under Ohio law, they possessed standing. The second reason is that the assignments, which the appellants complain of, were simply not part of debt collection activities. They were executed and recorded, as I said, 2007, 2008, 2009. The defaults here occurred in 2011 and 2012, and therefore they cannot be part of debt collection activity. There were also a number of decisions which held that the mere transfer of security interest is simply not an activity made in connection with debt collection. If you win on the FDCPA claims and the ODSPA claims, that's all of the claims? OCSPA, yes. That's all there is here. The OCSPA claim is predicated virtually entirely upon the FDCPA claim. The argument that the appellants have made is that an FDCPA violation is per se a violation of the Ohio Consumer Sales Practices Act, and that is simply not the case. You still must satisfy the requirements of such a claim. You still must show that there is a supplier and a consumer transaction, and based upon the Anderson decision, Anderson v. Barkley, that does not apply here. They cannot establish that claim at all. That is because in the Anderson decision, it was held by the Ohio Supreme Court, that loan servicing, as opposed to origination or offering of a loan to a consumer, is not a consumer transaction. It is a transaction between, in effect, the lender and the loan servicer, and also that loan servicers are not suppliers. This applies equally to the law firm appellees here and to the LPS appellees. There is a recent decision, which we found, a 2014 decision, January 28th, out of the Northern District of Ohio called Rivnak, which specifically held that the Anderson decision applies to law firms and vendors. In addition, there is the financial institutions exemption under the OCSPA. Financial institutions, which are defined to include national banks, which were the foreclosing plaintiffs here, are absolutely exempt under the OCSPA. In addition, when the underlying transaction is exempt, all other parties who acted in connection with that transaction are exempt from suit. And that's what was held in Dijon and Perkins and Lamb, which are cited in our brief. And again, I have to circle back to the fact that there was no deceptive act to support a claim under the Ohio Consumer Sales Practices Act because, again, the foreclosing plaintiffs, each and every one of them, were holders of the note. So the assignments, whether or not there was any defect in them, is completely irrelevant. And I would point out to the Court, just to be clear, that the assignments contain no gaps, the chains of assignments in this case. They go from... Now, we understand that, but that's not the basis for the District Court's opinion. No, it was not. They say there's some possibility of double recovery. There is none. Judge... How are we to be sure of that? Judge, this Court, in the seminal case of Livonia Properties, discussed standing in the context of void versus voidable transactions. In Livonia Properties... Pardon? It is a Michigan case, but candidly, Judge, Livonia Properties is the seminal case nationwide with respect to the issue of standing. It is the one case that is consistently cited in lien theory states, title theory states, judicial foreclosure states, and non-judicial foreclosure states. Cited in Ohio? No, it was cited under Michigan law, but under general... You say it's cited nationwide. Oh, it's cited... Yes, it's cited in Ohio, Judge. Excuse me. Livonia Properties has this to say about the risk of double recovery, and Your Honor can look at the decision. If the foreclosing plaintiff was the holder of the note, there is no risk of double recovery. Your Honor, candidly, unless the Court has any further questions, I have nothing further to say. Okay. Thank you, Mr. Goldberg. I'd like to thank the Court. This is my first time before the Sixth Circuit. I've enjoyed it. Well, I'm happy to have you and come back. Any other argument from your side? No. Okay. I apologize, Your Honor. That's okay. You may proceed. I'll do my best to do this in five minutes, Your Honors. That's a lot of time. Let's start with the fact that our allegation is that they were not holders of the notes. So the allegation, which is what you're here to address in an appeal of a 12B6 decision, is that they were not holders of the notes. They were not what? That the plaintiffs in the underlying foreclosure cases were not holders of the notes, necessarily. It was never established that they were or proven that they were. There's no evidence. Because we haven't gotten to the evidence part of the case yet. Our allegation, which is what this court is assigned to take a look at, is that they did. And attached to a holder of the notes, does that mean physically there's a holder? Physical. In Ohio, you can be a holder of a note in two ways. It can be endorsed specially to you, a check payable to Judge Cole and signed on the back to Judge Hood. Or it could be endorsed in blank by Judge Cole, and you could hold it, Judge Rogers. That can't be electronically. That has to be on a piece of paper. And you can't have a copy. Is that right? Right. And you can't have a fabricated copy. If you fabricate a check, and you take it to the bank, you go to jail. I'm feeling like today this may be wrong without remedy day here in the Sixth Circuit. Because if in fact there was an admitted wrong, there were fabricated documents, and they attached those backdated assignments, those forged assignments, those assignments without notaries who were actually notaries signing them. There's assignments, there's allegations in the complaint that documents were signed in one room and notarized someplace else without the notary witnessing the signatures. That the assignments from the parties who had not previously received an assignment, that there was notary fraud, that there was false representations about corporate authority. Then attaching that assignment just because it happened to be executed two or three years before to a lawsuit served on the wishes or the clerks or the thousands of other Ohio homeowners who have the right, even if they don't pay their mortgage, or it's alleged that they don't pay their mortgage, to due process of law. Ohio courts have decided in the Schwarzwald decision that a lender must have, there must be an actual controversy between two parties for the court to exercise jurisdiction under Ohio's Constitution, that there must be a justiciable controversy. In this case, our allegation is that because of the false statements made in the complaint that they pretended that there was a justiciable controversy for these three cases and for thousands of others, but there really wasn't. These three folks happened to get a lawyer and ended up in a much better situation than they would have, but for the thousands that didn't, this is a serious taking of rights. And LPS is not a loan servicer. They advertise on their website. They are the nation's premier default loan company. They are hired once a loan goes into default. They are clearly under the definition of the FDCPA, and they are affecting commerce, certainly when they start hiring law firms and directing them to file lawsuits in the courts of the state of Ohio with false assignments, with false endorsements of the notes. They could be a holder of a note, but if the note was payable to Judge Cole and it was endorsed by Judge Hood, and you're holding it, it doesn't mean you can enforce it. So just because they had a false statement in their pocket... Might mean someone else couldn't enforce it, though. Well, it may or may not mean that, because a lost note, there's a provision under the UCC in every state, including Ohio, that you can enforce a lost note if you explain how that note was lost or misplaced, and there's a process for that. So that's just not true. Homeowners were at risk, and in fact, their right to... And there's more at stake for these homeowners than just the fact that they didn't have a chance to defend these highly technical legal issues in court. There were federal programs that were evolving over the last three years to allow assistance to homeowners. The Save the Dream program in Ohio offers $25,000 to help homeowners catch up their loans. The HAMP program went through multiple evolutions during the time the LPS and their law firm co-conspirators were systematically engaging in this fraud. And at the end of the day, if any of my clients went to the bank and tried to pass off paper as bad as this to the bank, they would end up in jail. And all we're asking is that this court hold LPS, its subsidiaries, and the law firms that they conspired with, to a civil standard of liability for making these false statements to courts in the state of Ohio. Okay, thank you, Mr. Dan and Mr. Goldberg. Certainly appreciate your arguments today. The case will be submitted.